IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EMMANUEL A. POWE, SR.,<br><br>Defendant. | Criminal No. 3:21-cr-025-JAG-1 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, Raj Parekh, Acting United States Attorney for the Eastern District of Virginia, Olivia L. Norman, Assistant United States Attorney, and Shennie Patel, Trial Attorney with the U.S. Department of Justice's Environment and Natural Resources Division, hereby submits its Sentencing Memorandum.

The government has no objections or substantive corrections to the Presentence Report ("PSR") or the calculation of the advisory guidelines range. The probation officer determined that defendant's offense level is 16. PSR ¶ 61. With 3 points deducted for timely acceptance of responsibility, defendant's total offense level is 13. PSR ¶¶ 65, 124. Defendant has 2 criminal history points, resulting in a Criminal History Category II. PSR ¶¶ 75, 125. Defendant's advisory sentencing guidelines range is 15 to 21 months. PSR ¶ 125.

As set forth below, the government respectfully recommends a Guidelines sentence.

A. **RELEVANT FACTUAL BACKGROUND**

Defendant pleaded guilty to conspiracy to engage in an animal fighting venture, in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1) and (b), and 18 U.S.C. § 49. ECF No. 13. In support of that plea, defendant signed a statement of facts in which he admitted he conspired with others starting from in or before April 2013, and continuing through and

including July 11, 2018, to sponsor and exhibit dogs in animal fighting ventures, as well as to sell, buy, possess, train, transport, deliver, and receive dogs for the purposes of having the dogs participate in animal fighting ventures. ECF No. 14. Defendant, aka "Manny," admitted to having a dog fighting kennel named "BadIntents." Defendant further admitted to setting up chain weight dog fights with coconspirators OA and CM from 2013 to 2016. Electronic evidence indicated defendant maintained frequent contact with coconspirator OA. Defendant also admitted to directly participating in some of these chain weight dog fights, as well as in dog fights involving a several-week training regimen before the events, such as the April 3, 2016, two-card dog fight in King George, Virginia, that included all four coconspirators.

Specifically regarding the April 3, 2016, dog fight, defendant admitted to establishing with coconspirator OA the key terms for the fight, including the dogs' weights on the day of the fight, the forfeit amount, and wager. He admitted to traveling from Maryland to the event in which his dog was to fight against coconspirator CM's dog. Evidence indicates defendant's dog died after the fight. Video surveillance evidence showed defendant meeting up with others, including coconspirators OA and CH, in the Walmart parking lot in King George, Virginia, before being led to the fight location.

On July 11, 2018, agents seized from defendant's residence ten pit bull-type dogs maintained in conditions consistent with use in dog fighting ventures. Most of the dogs were housed separately and in small wire crates indoors or inside a hot garage with no ventilation. Agents reported that the dogs in the garage had no access to water or food and were housed in total









darkness with no light entering the garage. They were in crates that contained several compacted layers of mulch shavings that were saturated in urine and feces. Parts of the floor in the crates resembled a thick, solid, mud-like layer of old soiled mulch. The six dogs housed indoors were in the basement in similar conditions as those in the garage: the basement was covered in debris; the single bathroom had feces filled to the rim of the toilet; there was no food or water present; and rooms containing the dogs were covered with layers of mulch shavings, again saturated with urine and feces. All of the dogs were found sitting in severely soiled crates, and some of the crates were next to a treadmill. One of the dogs was isolated in a boarded off room and tied to a rope attached to a hook in the ceiling. The rope attached to the dog was short, not allowing the dog to lie down on the floor. The floor was also covered in layers of mulch, urine, and feces. This dog, along with several

other dogs in crates, were found housed in a pitch black area of the basement – there was no lighting source present. Seized electronics showed photos, saved to defendant's phone in 2017, of another dog in the same area of the basement, boarded off separately, and housed under similar conditions. When law enforcement approached the dogs, the dogs appeared eager for attention and some even attempted to get out of the cages. All of the dogs, once seized and removed from the residence, drank large amounts of water. The agents reported that the smell in the basement and the garage was unbearable. (See Exhibit A, pages 2-12).



Veterinary assessments of the dogs indicated several of the dogs had old scars on tails, ears, noses, and legs, as well as puncture wounds. Some of the injuries were a result of the rough crates in which some of the dogs were housed. Following a period of time in which the dogs received medical care, good nutrition, human playtime attention, and behavioral assessments, four of the seized dogs had to be euthanized by a veterinarian after they were determined to be too dog-aggressive to be considered for rehabilitation.[1]

During the July 2018 search warrant on defendant's residence, agents also seized dog houses, dog training equipment, and a breeding stand. Seized electronics contained photos of a dog being forcibly restrained using the same breeding stand as the one seized. Overall, agents found approximately 16 dog crates / dog houses, at least 14 dog collars, dog training treadmills,

---

[1] Although some dogs seized and forfeited or abandoned as part of fighting investigations can be eventually be placed into adoptive homes, that is not true of all such dogs, and it generally only occurs after months of intensive rehabilitation and evaluation by highly trained professionals.

training poles, a breeding stand, a "bark control" collar on the dog tied to a rope in the ceiling, thick training collars on most of the crated dogs, and various medical first aid pet supplies, including jars of wound care ointments, wound dressings, antibiotics, and energy fat supplements intended for horses.

Based on electronic evidence, defendant frequently maintained contact with coconspirator OA up until agents executed a warrant on OA's residence in June 2016. Cell phones seized from defendant in 2018 indicated that defendant had saved OA's post-search warrant cell phone number in the phone's contacts list as "O." Despite a federal warrant on one of his regular dog fighting contacts, defendant continued to engage in furthering his dog fighting ventures, specifically through active engagement in dog breeding as well as possession and transportation of dogs for fighting purposes.

In fact, defendant admitted to law enforcement to being primarily involved in the breeding and selling of dogs for use in dog fighting. Electronic evidence seized from his residence corroborated his statements. Stored photos on defendant's cell phone revealed multiple texts discussing breeding and exchanging fighting dog pedigrees under defendant's kennel name, BadIntents. Metadata indicates many of these photos were stored on defendant's phone in 2017-2018. As stated above, some of the photos include forced breeding photos using the same breeding stand seized from defendant's residence, as well as the same dog that was restrained with a rope tied to the ceiling seized from defendant's residence in July 2018. (See Exhibit A, pages 25-26).

Other texts in 2017 show defendant engaging in dog fighting activity with other fighters. For example, defendant and other fighters exchanged dog fighting pedigrees, photos of dogs, and proof of breeding photos in December 2017. (Dog fighters often exchange proof of breeding

photos and photos of resulting puppies for sale.) Some of these photos show dogs being restrained while breeding with clear evidence of blood on the breeding stand. (See Exhibit A, page 29 of breeding photo sent to defendant). In addition, text messages in November and December 2017 on defendant's phone with other dog fighters show defendant talking about arranging with transporters to transport dogs for fights (referred to as being "hooked."). For example:

> 12/6/2017 Text conversation:
> DOG FIGHTER:      Transporter trying to get in contact! He's in my area now! You still sending the general.
> DEFENDANT:        We hooked him on Saturday… I totally forgot about the transporter.     [Bates No. DF_EP_SW_0000206]



Electronic evidence also revealed a continued relationship with coconspirator CH, showing that defendant possessed a particular dog in October 2017, which had also been in the possession of coconspirator CH earlier that same year for breeding purposes. Photos on defendant's phone, dated October 2017, show the dog, in good condition, restrained in defendant's backyard. This same dog, which has distinct facial markings and was identified by law enforcement as USM 204, was seized from coconspirator CH's residence in July 2018.  Evidence from coconspirator CH's cell phone indicated that CH previously possessed the same dog as well as her puppies, at his residence, in September 2017, one month before the photo taken of the dog in defendant's backyard. At some point, the dog ended up back in coconspirator CH's possession after being photographed in defendant's yard. In June 2018, coconspirator CH texted photos and a video to another person showing USM 204 in his backyard with significant injuries (cause

unknown) of missing fur and skin from her hind legs. (See Exhibit A, pages 14-21). Coconspirator CH texted the other person that the dog was "my bitch from Manny."



When agents seized the dog from coconspirator CH's residence one month later, the fur on the hind legs appeared to be growing back in the same areas where the fur and skin were missing in the June 2018 photos taken by coconspirator CH. Veterinarians assessed the dog to be fearful, underweight, showing some scars, and requiring multiple extractions due to fractured teeth. The dog was determined to be not dog-aggressive and deemed a candidate for rehabilitation. (See Exhibit A, pages 14-22).

### B. LEGAL FRAMEWORK

The Animal Welfare Act makes it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture" – *i.e.*, the animal fights themselves. 7 U.S.C. § 2156(a)(1). Recognizing that it is extremely difficult to detect a dog fight in progress – and not wanting law enforcement to wait until after dogs are maimed or killed in fights to try to disrupt the unlawful enterprise – Congress also criminalized the many predicate activities without which animal fighting would not occur. In particular, it is also unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49.

### C. BACKGROUND REGARDING DOG FIGHTING

An organized dog fighting venture such as the one in which defendant and his coconspirators were involved bears no resemblance to the territorial quarreling pet dogs might have over food or a toy. It is a form of cruelty to animals – including the extreme forced weight loss and often grueling training involved before a match fight, the untreated injuries sustained inside the fighting ring by both dogs involved, and the not-so-immediate deaths occurring *after* the dog fights from injuries. These dogs do not enjoy the lives of a pet and many of these dogs spend most of their lives in cages or restrained by heavy chains outdoors, and are kept in close distance to other fighting dogs, keeping the anxiety level high. Many dogs are exposed to "roll" or "play" fights in which the dogs are trained to lunge at each other under controlled conditions – sort of a training to test the dogs' aggressiveness or "gameness" to fight. Overall, dog fighting involves taking advantage of pit-bull type dogs' eagerness to please humans, all for gambling purposes, possible financial gain, or a disturbing form of "entertainment."

### D. FEDERAL DOG FIGHTING CASELAW

Congress first enacted the federal animal fighting prohibition in 1976.[2] It was not until approximately twenty-two years later that the statute was actually prosecuted in 1997 and not again until the prosecution of Michael Vick in 2007, in this very division of the Eastern District of Virginia. The Vick case exposed the public to the extreme animal abuse involved in dog fighting, including the animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having routinely executed underperforming fighting dogs by drowning, hanging, and other brutal means. The

---

[2] See Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421.

following year, Congress increased the penalty from a misdemeanor to a five-year felony and significantly broadened the scope of the offense.[3]

Since 2008, law enforcement has increased its dog fighting prosecutions, but overall, only a few dozen cases have resulted. However, a notable trend emerged of above-Guidelines sentences, based primarily on the cruelty of the offense. Consequently, recognizing that a base offense level of 10 was inadequate, the U.S. Sentencing Commission increased the base offense level to 16 – the level at which it remains today [U.S.S.G. § 2E3.1] – stating that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

Many defendants in dog fighting cases filed shortly before or since the increased offense level still received above-guidelines sentences, based on factors including other crimes involved, a defendant's extraordinary cruelty to the animals, or the defendant's offense involving a fighting venture on an exceptional scale. See Application Note 2 to U.S.S.G. § 2E3.1 (allowing for upward departure). Generally, courts have assessed extraordinary cruelty to be evidence beyond that which is intrinsic in the fighting pit, such as the extreme inhumane killing of dogs outside of the ring (*i.e.,* – due to losing a fight) or severe neglect of the animals (*i.e.,* – suffering from untreated dog fight injuries). Likewise, an upward departure based on animal fighting on an exceptional scale involves an offense with an unusually large number of animals. Although not all federal defendants in dog fighting cases have received above-Guidelines sentences, there has

---

[3] See Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008, 122 Stat. 1461 (initial passage); Pub. L. No. 110-246, § 4(a), Title XIV, § 14207(a), June 18, 2008, 122 Stat. 1664, 2223 (re-enacting entire Farm Bill after enrollment glitch).

been a clear trend among judges in these cases to impose significant Guidelines sentences.[4] In many instances, the above-Guidelines sentences made up for the fact that the Guidelines did not account for the different levels of dog fighters and the varying degree of their involvement in a dog fighting enterprise.

The government submits that an above-Guidelines sentence is not warranted in this case but that a Guidelines sentence would be sufficient to meet the goals of sentencing based on the following analysis.

E. SENTENCING ANALYSIS

1. **The Guidelines Range is 15-21 Months.**

As stated above, the PSR correctly calculates defendant's total offense level as 13, derived from a base offense level of 16 for the count of conviction. See PSR at ¶¶ 56, 65; U.S.S.G. §§2E3.1(a)(1), 2X1.1. The government agrees with the Probation Office that this calculation is correct given the defendant clearly demonstrated acceptance of responsibility and in a timely manner. Applying a total offense level of 13 to Defendant's criminal history category of II, the PSR correctly derived a final Guidelines range of 15 to 21 months.

2. **A Guidelines Sentence is Consistent with the Goals of Sentencing Set Forth in 18 U.S.C. §3553(a).**

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a):

(1) "the nature and circumstances of the offense and the history and characteristics of the defendant;"
(2) the four legitimate purposes of sentencing;
(3) "the kinds of sentences available;"
(4) the Guidelines range itself;
(5) any relevant policy statement by the Sentencing Commission;
(6) "the need to avoid unwarranted sentence disparities among defendants;" and

---

4 See Exhibit B for list of examples of sentencings in various federal dog fighting cases.

    (7) "the need to provide restitution to any victims."

18 U.S.C. § 3553(a)(1)-(7). See also United States v. Hughes, 401 F.3d 540 (4th Cir. 2005).

  In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (quoting Gall v. United States, 128 S. Ct. 586, 597).

  This is a federal dog fighting case in which the defendant knowingly conspired with other dog fighters and engaged in varying activities supporting a dog fighting venture that covered several states. The defendant's criminal conduct involved wagering and the suffering of dogs and continued to promote a cruel and violent form of entertainment and status. The evidence shows that some of these fights were chain weight or "roll" fights and others were the dog fights that involved a rigorous several-week training regimen, and usually lasted until one dog died or was near death. We know that the April 3, 2016, dog fight involving defendant's dog lasted approximately 45 minutes, that the defendant's dog lost, and that the dog died. We also know that the other fight that occurred that night involving coconspirators OA and MA also lasted approximately 40 minutes and that one of the dogs died on the way home to New Jersey and was dumped in a trash dumpster.

The evidence further shows that defendant consistently engaged in the breeding and selling of fighting dogs, as shown by the large number of breeding photos and dog fighting pedigrees he exchanged with other dog fighters. Some of the breeding photos sent to and from defendant show the dogs restrained in aggressive manners while being forcibly bred. The evidence seems clear that these dogs are fighting dogs who would severely injure each other if not restrained. (See Exhibit A, page 29 (proof of breeding photo sent to defendant in December 2017)). Defendant's dogs were clearly not his pets, nor were they intended to be anyone else's pets. They lived in terrible conditions and were meant to serve only one purpose: being part of a dog fighting venture.

There are clearly varying levels of dog fighters: some who merely attend a fight here and there when invited; some who are professional handlers and are known as legends in the sport and dedicate all their time and money to their venture; and then there are some, like the defendant, who spend not all but a time actively engaged in the dog fighting world, by breeding, transporting, and occasionally fighting dogs.

Defendant clearly and consistently engaged in the training, breeding, and maintaining of dogs in a manner consistent with dogs used for fighting purposes. As indicated above, agents found and seized ten dogs at defendant's residence. These dogs were housed in deplorable conditions and were isolated from one another with barriers and had no access to food or water. These dogs did not appear to be pets with the possible exception of an eleventh dog, which was a bull dog that was apparently placed in a crate with a pit bull-type puppy to calm the puppy down. The bull dog, along with the other dogs, was found in the dark, hot,



stench-filled garage in the middle of summer in Maryland. So while this dog could arguably be claimed as a pet, he was clearly treated in a contrary manner. Defendant also possessed items, as detailed above, commonly used by dogfighters to train dogs for fights and treat them when injured without having to seek a veterinarian. Essentially, while defendant is not necessarily a ringleader in the sport, his involvement was indeed significant and continuous. In this case, a Guidelines sentence is necessary to meet the ends of Section 3553(a), as described in further detail below.

### (a) Nature and Circumstances of the Offense

The PSR, Statement of Facts, and overt acts as outlined in the Information, contain numerous examples of defendant's criminal conduct. Defendant's conduct demonstrates that his offenses were intentional and significant. In fact, his criminal conduct did not involve a solitary violation or participation in a single fight that might be explained as a single instance of bad judgment or a limited scope of misconduct. Rather, the defendant played many roles. As a sponsor, transporter, trainer, and dog fighter, defendant persistently committed offenses over an extended period of time and with full knowledge that he was breaking the laws of the United States.

A dog fighting venture requires significant dedication over time, and defendant, as well as his coconspirators devoted their time and effort toward engaging in this criminal activity. Any sentence should reflect the seriousness of the defendant's extensive involvement.

### (b) History and Characteristics of the Defendant

As described in more detail above, evidence gathered in this investigation and items seized from the defendant and his coconspirators showed that defendant had been involved in

13

dog fighting since at least 2013, demonstrating that his involvement was not fleeting or casual, but a significant feature of his life for approximately a decade.

As described in the PSR, the defendant, however, has a Bachelor of Arts degree and maintained steady employment and in fact has been employed by the same employer since 2001 and earns a good salary. See PSR ¶¶ 93-94. He also comes from a large family, being one of nine children born to his parents, and by his own account, although his family were poor, he recalled being spoiled by his grandmother and maintaining regular contact with his family. Defendant has four children and a step-child with his wife of 23 years, and two children from a prior relationship. By all accounts, his children are doing well academically, and are attending high school or college. Defendant's income currently pays for one of his children to be in college and will support two of his other children when they attend college in the fall of 2021. See PSR ¶¶ 91-110. Defendant's record does not reflect a life of drugs or abuse and in fact, he appears to be a mentor to youth in his community by volunteering, among other things, as coach in various athletics. See PSR ¶¶ 91-112.

In reading the PSR, defendant has many positive aspects in his life: a secure profession; a large and supportive family; and a respected role in his community. But there is clearly another side to defendant's life, and that other side is his entrenched involvement in dog fighting. Defendant has had prior run-ins with animal control, but in 2006, local authorities discovered an extensive dog fighting operation in his residence's basement, resulting in multiple counts of animal cruelty in 2006. See PSR ¶ 71. Authorities located eight or nine dogs – many with scars -- crowded in separate crates or areas of the basement and living in deplorable conditions. None of them had access to food or water, and all of them were languishing in their own waste. Authorities, in removing the animals, also observed and photographed equipment believed to be

14

evidence of dog fighting. Unfortunately, despite expressing that he was "getting out of the dog business," the evidence in this case undeniably shows that defendant did not get out of the business. In fact, in 2018, authorities again, 12 years later, exposed a dog fighting venture in the same house; the same house where he has been raising his children, ages 17 through 22. The fact that defendant continued to engage in the cruel world of animal fighting negates any consideration of leniency defendant might otherwise be entitled for otherwise living a "clean" life.

### (c) Seriousness of the Offense, Respect for the Law and Just Punishment

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act.[5] The recent amendment of the substantive guideline by the Sentencing Commission, as discussed above, further underscores the seriousness of the offense. See Sentencing Guidelines for United States Courts, 81 Fed. Reg. at 27,265 ("[t]he Commission [ ] determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes"). Also, given the extensive, secretive networks that are needed to solicit opponents and to locate, buy and sell dogs of particularly coveted bloodlines, dog fighting is organized crime in the traditional sense of that term. The seriousness of this offense weighs in favor of a significant Guidelines sentence.

---

[5]   Congress has strengthened the law four times over the last thirteen years, including: the Animal Fighting Prohibition Enforcement Act of 2007, Pub. Law 110–22, 121 Stat. 88, which increased animal fighting from a misdemeanor with a one-year statutory maximum to a felony with a three-year statutory maximum; the 2008 Farm Bill, Pub. Law 110–234, Sec. 12407, 122 Stat. 923, which raised the statutory maximum to five years, relaxed the interstate commerce element, and added substantive prohibitions; and the 2014 Farm Bill, Pub. Law 113-79, Sec. 12308, 128 Stat. 649, which made attending animal fights a misdemeanor offense and added a felony offense for bringing anyone 16 years or younger to an animal fight.

15

### (d) Need to Afford Adequate Deterrence to Criminal Conduct

Deterrence comes in two forms: deterring the current defendant from committing additional crimes, and deterrence of future defendants from committing similar crimes. Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it.

In defendant's case, evidence shows he had more than a casual friendship with coconspirator OA, with whom he participated in many dog fights, including the April 2016 fight. Defendant was most likely aware of the June 2016 warrant, given his past continuous contact with OA and possession of OA's new contact information after the 2016 warrant. However, defendant continued to fully engage in furtherance of his dog fighting ventures, specifically through active engagement in dog breeding and transportation and coordination of fights with other dog fighters, including coconspirator CH. This indicates that a prior federal search warrant executed on a close fellow coconspirator was not sufficient to deter defendant from continuing to engage in dog fighting activities, nor was his own prior interaction with animal control authorities.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon municipal and charitable animal shelters, it is imperative that the sentences imposed in the cases that *are* able to be brought send a strong message of deterrence. Dog fighting tends to involve a private, closely-knit groups of individuals, but nevertheless, many other dog fighters are watching the outcome of this and other federal dog fighting cases in the country. Those who choose to brutalize animals for entertainment, profit, and status must know

that their criminal conduct will be severely punished. Consequently, a Guidelines sentence as set in the Guidelines range calculated in the PSR is needed to "afford adequate deterrence to criminal conduct," both to defendant and to other similarly situated potential offenders. 18 U.S.C. § 3553(a)(2)(B).

### (e) Need to Avoid Unwarranted Sentence Disparities

Defendant's advisory guidelines range in the PSR reflects the facts and circumstances of this case, and his criminal history. The multi-defendant federal dog fighting cases cited in Exhibit B to this memo also provide a reference point in avoiding unwarranted sentencing disparities under 18 U.S.C. 3553(a)(6). Some of those cases cited defendants with varying roles in the conspiracy, and their varying sentences reflected that. Some of the other cases, as in this matter, reflect defendants with similar roles and involvement, and their sentences reflected that also. The coconspirators in this case on all accounts were on par with each other as far as their experience and involvement in dog fighting ventures. They all possessed dogs over the years, and they were all involved in breeding, training, and fighting dogs – sometimes the fights were significant events, and others were roll fights or fights testing the dogs' "gameness" or willingness to fight. They all had similar training equipment and medical kits; they often shared the same transporters, and they often interacted with some of the same people in dog fighting.

At this time, only one of defendant's coconspirators has been sentenced and that is coconspirator MA from New Jersey who fought his dog and lost against coconspirator OA in the April 3, 2016, dog fight. (Defendant's coconspirator CM and opponent in the April 2016 dog fight is scheduled to be sentenced before defendant). On June 15, 2017, coconspirator MA plead guilty to sponsoring a dog in the April 2016 fight, as well as for possession of 18 dogs for purposes of participation in an animal fighting venture. He was initially charged in a complaint

with a dog fighting conspiracy beginning in 2015 and ending in 2016, which involved eight other defendants. He was the first defendant to plead guilty to an information charging him with sponsoring a dog in the April 2016 dog fight and with possession of 18 dogs for dog fighting purposes. Coconspirator MA was sentenced, *under the pre-2016 guidelines*, with a Guidelines range of 6-12 months, to a term of 24 months of imprisonment on each of the counts, to be served concurrently, and a $1,000 fine. See Transcript of Sentencing at 67-68, United States v. Atkinson, No. 3:17-CR-222-PGS-1, (D.N.J. Apr. 18, 2018) (Using pre-2016 Guidelines; varying upwards by 12 months because "[t]here needs to be a longer period of imprisonment. We need to give a message to society that anyone that's involved in dog fighting is going to be subject to greater penalties than this, because the activity itself is depraved – it's just a very depraved activity; it's horrific and it's upsetting to everybody to see that our animal friends would be treated in such a manner"). To avoid a sentencing disparity with the defendant's coconspirators and to accurately reflect the comparative length and significance of the defendant's involvement in dogfighting, a Guidelines sentence for the defendant is merited.

3. **Special Conditions of Supervised Release**

The Court should also include the special condition of supervised release recommended in the PSR. See PSR ¶ 5. The condition that Defendant be prohibited from possessing or owning any pit-bull type dogs or any breeds of dogs he intends to breed and/or sell, either personally or through a third party, is commonly imposed in dog fighting cases, and is appropriate given the nature of the offense.[6]

---

[6] See, e.g., United States v. Andrews, 7:16-cr-122, ECF No. 358 (Judgment) at 6 (E.D.N.C., Dec. 22, 2017); United States v. Love, 3:17-cr-51, ECF No. 295 (Judgment) at 3 (D.N.J. July 8, 2019).

18

## F. CONCLUSION

Considering all of the 18 U.S.C. § 3553 sentencing factors, including the defendant's complete and timely acceptance of responsibility and the relevant Guidelines provisions and case law discussed above, a Guidelines sentence as calculated in the PSR would be sufficient without being greater than necessary to fulfill the purposes of sentencing. The Court should also impose a term of three years of supervised release in this case. Given Defendant's long-running participation in dog fighting, the maximum term of supervised release – three years – is appropriate, to help ensure that he does not return to the unlawful activity that played a prominent role in his life.  18 U.S.C. § 3583(b)(2).

Respectfully submitted,

| RAJ PAREKH<br>ACTING UNITED STATES ATTORNEY<br><br><br>_____/s/_____<br>Olivia L. Norman<br>Assistant United States Attorney<br>V.S.B. No. 31418<br>Office of the United States Attorney<br>919 E. Main Street, Suite 1900<br>Richmond, Virginia 23219<br>(804) 819-5475<br>(804) 771-2316 (facsimile)<br>Olivia.Emerson@usdoj.gov | TODD KIM<br>ASSISTANT ATTORNEY GENERAL<br><br><br>_____/s/_____<br>Shennie Patel<br>Trial Attorney, Environmental Crimes<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>150 M Street NE, Suite 4.111<br>Washington, D.C. 20002<br>(202) 305-0295<br>(202) 514-8865 (facsimile)<br>Shennie.Patel@usdoj.gov |

CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the counsel of record.

By: _____/s/_____
SHENNIE PATEL
Trial Attorney, Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street NE, Suite 4.111
Washington, D.C. 20002
(202) 305-0295
(202) 514-8865 (facsimile)
Shennie.Patel@usdoj.gov